Brian C. Brook (No. 050442013)
CLINTON BROOK & PEED
641 Lexington Ave., 13th Floor
New York, New York 10022
Tel: (212) 328-9559
Fax: (212) 328-9560
brian@clintonbrook.com

*Attorneys for Plaintiffs,*
*High Crest Functional Medicine, LLC, Immunogen Diagnostics, LLC,*
*Michael Segal, M.D., and Neelendu Bose*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HIGH CREST FUNCTIONAL MEDICINE, LLC, IMMUNOGEN DIAGNOSTICS, LLC, MICHAEL SEGAL, M.D. and NEELENDU BOSE., <br><br> Plaintiffs, <br><br> v. <br><br> HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, INC., and MERCK & CO., INC., <br><br> Defendants. | Civil Action No. <br><br> ECF Case <br><br><br> **COMPLAINT** <br> **AND JURY DEMAND** |

Plaintiffs, High Crest Functional Medicine, LLC, a New Jersey limited liability company, Immunogen Diagnostics, LLC, a New Jersey limited liability company, Dr. Michael Segal, M.D. ("Segal"), an individual, and Neelendu Bose ("Bose"), an individual residing in New Jersey, by way of Complaint against the Defendants Horizon Blue Cross Blue Shield of New Jersey, Inc., a New Jersey corporation ("Horizon"), and Merck & Co., Inc., a Delaware corporation with principal corporate headquarters in New Jersey ("Merck"), say:

1

## NATURE OF THE ACTION

1. This action is primarily to recover the payment of medical benefits that were wrongfully and systematically denied to patients whose medical claims were administered by New Jersey's largest insurer, Horizon Blue Cross Blue Shield.

## PARTIES

2. Plaintiff High Crest Functional Medicine, LLC ("High Crest"), is a New Jersey limited liability company, which provided health care treatment to patients in Fairfield, New Jersey from in or about mid-2007 through January 2015. At all relevant times High Crest Functional used a separate entity, High Crest, LLC, to provide administrative services, office space, and non-physician staffing.

3. Plaintiff Immunogen Diagnostics, LLC ("Immunogen"), is a New Jersey limited liability company, which provided diagnostic and testing services to patients of High Crest.

4. Plaintiff Michael Segal, M.D., is a licensed medical doctor currently practicing medicine in the State of Pennsylvania. He previously practiced as a licensed physician in the State of New Jersey, but he declined to renew his license in 2015. At all relevant times Dr. Segal was the owner and managing member of Plaintiff High Crest Functional Medicine, LLC. Dr. Segal also served as the medical director for Plaintiff Immunogen Diagnostics, LLC.

5. Plaintiff Neelendu Bose is an experienced financial analyst who started to transition to offering healthcare administration, management, and compliance services in or about 2006. At all relevant times he was the principal owner of High Crest, LLC and Plaintiff Immunogen Diagnostics, LLC.

6. Defendant Horizon Blue Cross Blue Shield of New Jersey ("Horizon") is a New Jersey corporation that administers self-funded healthcare plans created by employers in New Jersey and also provides health insurance and administrative services.

7. Defendant Merck & Co., Inc. ("Merck") is a Delaware corporation with principal corporate offices in in New Jersey. It sponsors one or more self-funded healthcare plans for its employees that have claims administered by Horizon.

## JURISDICTION AND VENUE

8. This Court has jurisdiction of Plaintiffs' primary claims pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1331 because the claims arise under the Employee Retirement Insurance Security Act of 1974 ("ERISA").

9. This Court has supplemental jurisdiction over all of Plaintiffs' other claims, which arise under New Jersey state law and form part of the same case or controversy with the federal claims, pursuant to 28 U.S.C. § 1367.

10. Venue over the ERISA claims is appropriate in this District because it is where the relevant plans are administered and where the conduct constituting breaches occurred. 29 U.S.C. § 1132(e)(2).

## RELATED ACTION

11. On July 26, 2012, an action was filed in the name of and on behalf of Plaintiffs in the District of New Jersey against the same defendants named here and others. It was docketed as *Neelendu Bose et al. v. Horizon Blue Cross Blue Shield of New Jersey*, 12-cv-04671 (hereinafter, the "2012 Action"). Horizon ultimately asserted counterclaims and third party claims. For a variety of reasons, and after several years of stagnation, the remaining parties agreed to litigate their claims and counterclaims with a fresh start, permitting each to revise and clarify their contentions while continuing to proceed expeditiously with certain discovery by consent. The parties signed a confidential tolling and case management agreement that provides, *inter alia*, for the dismissal without prejudice of the 2012 Action after filing and docketing of this Complaint.

## FACTS COMMON TO ALL COUNTS

### Background

12. High Crest and Immunogen were involved in the business of providing health care and diagnostic services to patients.

13. Horizon issued, insured, and administered the employee benefit plans through which a number of the Plaintiffs' patients received their insurance.

14. Plaintiffs High Crest and Immunogen bring this case as nonparticipating, or "out of network," providers, meaning that neither High Crest nor Immunogen participated in Horizon's physician networks during the period from March 1, 2011 to present.

15. As nonparticipating providers in Horizon's physician networks, High Crest and Immunogen were harmed by underpayments or non-payments made by Horizon for out of network services they provided to plan enrollees.

16. Participating, or in-network providers are physicians who have signed a contract with a particular managed care entity and receive reimbursement of eligible charges directly from that entity. Participating providers agree to provide healthcare services to plan enrollees at reduced rates in exchange for, among other things, access to the plan's patient base. When visiting a participating provider, plan members are only responsible for co-payments, co-insurance, and payment for non-covered items at the time of service.

17. In contrast, nonparticipating providers do not have a signed contract with a particular managed care entity. Nonparticipating providers, therefore, may collect their full charges directly from patients at the time of service and are not required to accept reduced rates for procedures performed.

18. Rather than require plan members to pay out of pocket and in full for medical services, nonparticipating providers may also agree to accept an assignment of benefits, which

occurs when a plan member authorizes his health benefits plan to remit payment directly to the provider for covered services. Assignment may also occur by executing an express assignment to exercise any and all rights under federal and state guidelines, including among other things rights to reimbursement for healthcare claims, appeal denials, and pursue legal action.

19. As the company that issued, insured, and administered the employee benefit plans through which a number of Plaintiff's patients received their insurance, Horizon was generally subject to ERISA and its governing regulations.

20. For other patients who were government employees, Horizon was subject to various New Jersey state laws.

21. Each patient signed an explicit assignment of benefits or other documentation sufficient to authorize the assignment of the patient's rights and benefits to the providers.

22. When Horizon received claims, Horizon determined whether the claims would be paid or how much would be paid on each claim. When a patient or health care provider disputed a nonpayment or underpayment, an appeal was made to Horizon directly. Horizon then determined the validity of the appeal.

23. By breaching the terms and conditions of its health care plans, as alleged herein, Horizon has violated its duties and obligations under ERISA.

### Horizon Abuses Its Own Claims and Appeal Procedures to Cut Off Payments to High Crest and Immunogen

24. On March 14, 2011, Plaintiffs received a letter from Megan McCarthy, Horizon's lead investigator for their Legal Affairs Division. The letter requested to audit approximately thirty patients of High Crest.

25. High Crest responded by letter soon thereafter, advising that High Crest was willing to comply with the requested audit as long as the audit would be conducted with procedures

compliant with the Health Insurance Portability and Accountability Act ("HIPAA"), to ensure that all the patients maintained their right to privacy.

26. Subsequent to High Crest's reply regarding the audit request, Horizon refused to pay virtually all claims submitted by High Crest.

27. High Crest had been placed on "prepayment review" by Horizon, which was an excuse for systematically denying all of the claims they submitted.

28. Plaintiffs sent their first ERISA appeal to Horizon on April 15, 2011. However, that appeal along with many others sent since that time have gone ignored or have been denied, some without any explanation, and others with boilerplate explanations that oftentimes included reference to information that was clearly not presented by the particular patient at issue.

29. It appears that there were only three exceptions to Horizon's policy of blanket denials in or about 2014 when, after appeals, Horizon finally authorized payment for three patients out of the hundreds of Horizon patients seen by High Crest. On information and belief, these limited payments were authorized by Horizon solely for purposes of this litigation in order to prevent Plaintiffs from asserting that Horizon was denying everything due to pending litigation, which Horizon well knows is not a valid reason to deny a claim, particularly one submitted pursuant to ERISA.

30. High Crest's and Dr. Segal's former attorney contacted Ms. McCarthy in an effort to facilitate the audits requested by Horizon, and the appeals by High Crest.

31. High Crest agreed to the audit under the following conditions:

    a. Horizon shall provide a list of patient files they sought access to so that the files could be prepared in advance and any information not related to Horizon's relationship with the patient be redacted;

   b. Horizon shall provide proof that all patient files requested were Horizon subscribers;

   c. Horizon shall maintain the files provided to them so that there would be no issues with respect to original documents; and

   d. Horizon shall provide reasonable information regarding the review process, such as which employees would be involved and which polices and procedures would be used.

32. Horizon agreed to provide the list of files they sought to review and a mutually agreeable date to conduct the audit would be determined, but refused to provide information on the personnel, policies, and procedures that it would use in its review process.

33. On April 29, 2011 Horizon sent a letter agreeing to provide Plaintiff with a patient list in order to facilitate the audit and Horizon requested that the audit take place within two weeks of the letter, dated April 29, 2011.

34. On May 5, 2011 Plaintiff's previous attorney asked Horizon to contact her to set up an audit date and to forward the list of patients subject to the audit.

35. On May 9, 2011, instead of responding to the May 5, 2011 letter to schedule the audit, Horizon sent a letter, which informed Plaintiff that, in addition to investigating claims submitted by patients of High Crest, Horizon would also be investigating claims submitted by Immunogen.

36. On May 23, 2011 Horizon requested a number of patient records from Immunogen; all of the outstanding claims for these patients were denied by Horizon without any explanation.

37. On June 14, 2011 a supplement to the first ERISA appeal was sent to Horizon.

38. In this letter, High Crest renewed the request for information about the audit procedures, including the personnel involved.

39. In an effort to move the investigation along, High Crest stated that the patient records requested from Immunogen were ready for inspection.

40. The letter further asked Horizon to give the following information:

   i. the date and time the inspection would be conducted;

   ii. the process by which the inspection would be performed;

   iii. to identify who would perform the inspection;

   iv. to confirm the chain of custody to ensure that the records would not be given to anyone without prior disclosure and approval; and

   v. written confirmation that the appropriate measures would be taken by Horizon to ensure the proper destruction of all data produced to Horizon including any and all copies.

41. On June 15, 2011 Horizon responded that there was no way to tell where the investigation would lead, so there was no way to provide any sort of procedure for how the records would be reviewed including who may see them or the potential destruction of the records.

42. A second ERISA appeal was sent on June 16, 2011 when a letter was sent to Horizon attempting to gain any information as to why Plaintiff was being targeted by Horizon and why the claims were not being paid.

43. Ms. McCarthy was not able to give any response as to why Plaintiff was being targeted by Horizon other than to suggest that Horizon was interested in the structure and relation between High Crest and the business management entity, High Crest, LLC.

44. On June 16, 2011 another ERISA appeal was sent to Horizon that again asked for the basis or reasons behind Horizon's refusal to pay claims submitted by Plaintiff.

45. On June 17, 2011 Horizon sent a letter that explained some of the audit procedures, but Horizon continued to maintain that they were not able to say exactly who would be viewing the records taken from the Plaintiff because they did not know where the investigation would lead.

46. On June 17, 2011 a letter from Plaintiff's previous attorney requested that Horizon not contact Plaintiff directly and direct all correspondence to Plaintiff's attorney.

47. This letter again asked Horizon for information surrounding the investigation but no explanation was given.

48. The letter also stated that the documents requested by Horizon on May 23, 2011 had been assembled for inspection.

49. However, instead of making an appointment to review the requested documents or providing an explanation for the investigation, Horizon sent another letter on June 13, 2011 to request three times as many patient records.

50. In a letter dated June 17, 2011 Horizon responded to Plaintiff's previous letter from June 17, 2011.

51. The letter claimed that in order to protect the integrity of the investigation, Horizon could not reveal the entirety of the findings to date. The only information provided to High Crest was a bald assertion that there was "evidence" that material misrepresentations were made on claim forms submitted on behalf of High Crest. (Of course, none of this supposed "evidence" has ever been substantiated, even in the four-and-a-half years since.)

52. On or about June 20, 2011, an audit of the original files requested for High Crest was conducted at the former attorney's office of High Crest.

53. On or about June 22, 2011, an audit of the original files took place at the office of High Crest's former attorney.

54. On or about June 30, 2011 a letter was sent to Horizon that detailed High Crest Functional Medicine, LLC's compliance with the request for information. Despite detailing High Crest Functional Medicine, LLC's compliance with all requests made by Horizon, Horizon continued to suspend the processing of any of High Crest's claims.

55. On July 1, 2011 Horizon responded to a request for information regarding the supposed wrongs allegedly committed by the Plaintiff.

56. Horizon indicated that the investigation was based on the claims submission of Immunogen and the legality of the practice structure of High Crest (presumably, Horizon questioned the relationships between High Crest Functional Medicine, LLC, Immunogen Diagnostics, LLC, and High Crest, LLC) based on the fact that the referrals for laboratory testing originated from High Crest.

57. Soon afterwards, there was a meeting between the attorneys for High Crest and Immunogen attorneys for and Horizon to discuss the concerns Horizon claimed to have with Horizon's business.

58. Horizon's attorneys claimed that they were investigating the structure of the business, non-medical personnel administering injections, duplicate claims, unbundling services, and treatments that were not medically necessary.

59. Horizon circumvented the ERISA process and prevented the Plaintiff from having the full and fair review they were entitled to under ERISA by creating the fraud investigation.

60. A full and fair review would have required Horizon to provide an opportunity to the provider to appeal the denial of the claim and provide access to all relevant plan documents used to deny the claim.

61. Since for months on end, there was no denial of the claims, only the ongoing investigation, High Crest and Immunogen were unable to obtain the full and fair review they were entitled to.

62. By the time the denials came, it was apparent that the reasons stated therefore—typically assertions that the charges were not medically necessary or not supported by sufficient documentation—were fabrications and *post hoc* rationalizations.

63. For example, Horizon denied coverage for numerous office visits as being not "medically necessary." The denials were nonsensical because even if a doctor could, hypothetically, disagree with the ultimate treatment decision, the office visit itself is inherently necessary to ascertain the patient's complaints and attempt a diagnosis.

64. Horizon not only denied payment to High Crest for office visits, but also to Immunogen for diagnostic tests that were necessary to determine the cause of the patients' symptoms.

65. Contrary to all common sense, Horizon nevertheless routinely approved payment for the actual medications that were prescribed for the patients. Obviously, if the prescriptions were necessary, then the office visit and diagnostic tests necessary to get to the point of prescribing medication must have been necessary as well.

66. Horizon's denials cannot withstand reasonable scrutiny under any standard of review, but because Horizon in fact had a substantial conflict of interest, as will be proven at trial,

and used improper and illegal means of claims administration, Horizon is not entitled to any deference in its determinations of High Crest's and Immunogen's claims.

## Damages

67. Since Horizon's investigation and refusal to pay claims, either partly or completely, High Crest and Immunogen have suffered financial losses of approximately over $3 million just in terms unpaid or underpaid claims.

68. Moreover, all Plaintiffs have suffered the substantial loss of business due to patients and other customers leaving as a consequence of Horizon's reckless and vexatious actions.

## COUNT I

### Failure to Establish and Follow Reasonable Claims Procedures or to Provide Full and Fair Review in Violation of ERISA, and Wrongful Denial of Benefits in Violation of ERISA

69. Plaintiffs incorporate the allegations of the foregoing paragraphs as though fully set forth herein.

70. Plaintiffs High Crest and Immunogen provided healthcare services to patients who were beneficiaries under ERISA-governed group health plans, including at least one plan sponsored and administered by Merck.

71. For all of the ERISA-governed group health plans at issue, Horizon was the claims administrator.

72. Plaintiffs received assignments of benefits or other documentation sufficient to authorize the assignment of patients' benefits to Plaintiffs.  Moreover, Horizon is estopped from denying that benefits were validly assigned to the extent that Horizon engaged in communication with Plaintiffs about particular patients, their claims, and their benefits.

73. Since 2010, Plaintiffs submitted thousands of claims that met all of the necessary requirements for being paid pursuant to the ERISA-governed group health plans administered by Horizon.

74. Accordingly, pursuant to the terms of the ERISA plans that governed the claims at issue, Horizon was required to authorize payment of the claims submitted.

75. Plaintiffs were entitled to receive protections under ERISA including, *inter alia*, (a) compliance by Horizon with ERISA claims procedure regulations; (b) receipt of accurate materials summarizing their patients' group health plans, known as Summary Plan Descriptions ("SPD"), as well as additional materials under § 102 of ERISA, 29 U.S.C. § 1022; and (c) a "full and fair review" on appeal of all claims denied by Horizon.

76. Horizon violated ERISA's claims procedures in a number of ways, including, *inter alia*, its extended placement of Plaintiffs on "prepayment review"—a concept which does not appear anywhere in any ERISA statutes or regulations—to avoid making final determinations of payments of benefits for months on end. This contravened the timing of claims decisions set forth in 29 CFR 2560.503-1(f), as well as the overarching purposes of ERISA, such as streamlining the processing of claims and preventing administrators from engaging in shenanigans designed to deprive employees of their rightful benefits.

77. Horizon failed to provide a "full and fair review: of denied claims pursuant to §503 of ERISA, 29 U.S.C. §1133, and its implementing regulations by, *inter alia*, failing to disclose the "specific reasons" for benefit denials and failing to comply with appeal procedures imposed by ERISA and federal common law.

78. Plaintiffs have been harmed as a direct and proximate result of Defendants' failure to make payments in accordance with the terms of the ERISA-governed group health plans because Plaintiffs have not received payment of the benefits that were assigned to them.

79. Plaintiffs High Crest and Immunogen are entitled to damages in an amount not less than that of the benefits untimely or otherwise wrongly denied plus the costs of appeals.

## COUNT II

### Breach of Fiduciary Duties under ERISA

80. Plaintiffs incorporate the allegations of the foregoing paragraphs as though fully set forth herein.

81. As the claims administrator, Horizon was a fiduciary to the health plans it administered. 29 U.S.C. §1002(21)(A).

82. As the plan administrator for the plans used by at least one patient who visited High Crest and Immunogen, Defendant Merck was likewise a fiduciary to the plan under ERISA. 29 U.S.C. §1002(21)(A).

83. A participant or beneficiary may bring a civil action for appropriate relief pursuant to ERISA, 29 U.S.C. § 1132(a)(2).

84. As an ERISA fiduciary, Horizon owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence, and diligence that a prudent administrator would use in the conduct of a like enterprise. Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. §1104(a)(1)(B) and (D).

85. In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, Horizon violated its fiduciary duty of care.

86. As an ERISA fiduciary, Horizon owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106.

Horizon cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

87. Horizon violated its fiduciary duties of loyalty and due care by, inter alia,

    a. failing to conduct a definitive investigation with concrete findings or reinstate High Crest on regular payment status;

    b. improperly denying benefits;

    c. contacting High Crest patients directly and providing misinformation;

    d. alleging that there were unlicensed medical personnel without performing even the most cursory investigation into the credentials of the staff;

    e. refusing to engage Plaintiff in any meaningful way in Plaintiffs' attempt to recoup the money owed to them; and

    f. failing to send essential ERISA plan documents requested by Plaintiffs.

88. Even if Merck assigned all discretion regarding claims decisions to Horizon, Merck still had a fiduciary duty to monitor and supervise Horizon, as it had the authority to hire and fire the claims administrator.

89. Merck breached its fiduciary duty by retaining Horizon as its claims administrator notwithstanding being put on notice of multiple failures in Horizon's administrative efforts.

90. Due to Defendants' breaches of fiduciary duty, Plaintiffs are entitled to damages and equitable relief.

## COUNT III

### Defamation

91. Plaintiffs incorporate the allegations of the foregoing paragraphs as though fully set forth herein.

92. This Count III is stated against Defendant Horizon only.

93. Horizon is liable under principles of *respondeat superior* for the actions of its agent, Megan McCarthy, who was at all relevant times an employee of Horizon.

94. McCarthy made defamatory verbal statements to numerous individuals, including patients of High Crest and Immunogen, as well as prospective business partners and employees of Mr. Bose, Dr. Segal, High Crest and Immunogen, and did so with malice as the statements were knowingly false or made with reckless disregard for the truth.

95. McCarthy published defamatory writings to numerous individuals, including patients of High Crest and Immunogen, as well as prospective business partners and employees of Mr. Bose, Dr. Segal, High Crest and Immunogen, and did so with malice as the statements were knowingly false or made with reckless disregard for the truth.

96. McCarthy's defamatory remarks generally consisted of false assertions of fact that Plaintiffs, *inter alia*, have committed fraud, were themselves or had employees practicing medicine without a license, and were illegally providing body-builders with anabolic steroids for non-medical purposes.

97. Because many of the details of Horizon's "fraud" investigation have not been disclosed to Plaintiffs, discovery is necessary to ascertain the full scope of McCarthy's defamatory utterances and publications.

98. For the avoidance of doubt, this claim does not include statements made that were subject to the litigation privilege or otherwise absolutely privileged, although Plaintiffs reserve the right to later pursue claims for malicious prosecution.

99. As a direct and proximate result of Horizon's conduct Plaintiffs have been damaged in their professional reputation and furthermore have suffered substantial economic loss.

100. The aforementioned conduct of Horizon was done for the purpose of depriving the Plaintiffs of their reputations, dignity, property, and legal rights and was despicable conduct that subjected the Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, so as to justify an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for declaratory relief and judgment as follows:

  a. compensatory damages;

  b. consequential damages;

  c. punitive damages;

  d. treble damages;

  e. a judgment declaring that Horizon has failed to implement and follow full and fair claim review procedures;

  f. an order requiring Horizon to employ fair and reasonable claim review procedures going forward, and with this Court retaining jurisdiction to enforce the order;

  g. attorney's fees;

  h. all recoverable costs and expenses;

  i. prejudgment and postjudgment interest at the maximum legal rate; and

  j. such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: Newark, New Jersey
December 24, 2015

CLINTON BROOK & PEED

By: _____
Brian C. Brook

*Attorneys for Plaintiffs*
